In re **LAW RESEARCH SERVICE, INC.,**
Appellant,

v.

**GENERAL AUTOMATION, INC.,**
Appellee.

**No. 380, Docket 73–2115.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1974.

Decided March 14, 1974.

**203**

tomation, Inc. ("General"), for computer hardware and software sold and delivered. Law Research claimed below (1) that it owed nothing because General had not delivered the entire "software package" essential to operation of its service which had been contracted for [1] and (2) that at least it did not owe the $14,000 contract price for that software. The debtor also claimed that the controlling measure of its indebtedness, if any, was by way of a December 31, 1970, invoice for $103,485 (less concededly inapplicable quantity discounts) rather than a subsequently rendered "corrected invoice" dated back to the same date for $115,635 (less an inapplicable quantity discount). We agree with the court below and the referee on the software claim, but remand for further findings in respect to the proper amount of the invoice.

As stated, the debtor-appellant's business was supplying computerized legal research to lawyers; this was being done through a controlled subsidiary corporation in Pennsylvania, by way of a central computer, duly programmed with case materials, which processed questions from lawyers or law libraries through the use of remote computer terminals (teletypewriters) in their offices. In an agreement dated June 19, 1970, and signed by the parties on June 25, 1970, debtor agreed to buy and General to sell up to 50 computer systems and components, but if only a few were purchased the purchase price was subject essentially to disallowance of the quantity discount in whole or in part and was also subject to payment of $14,000 for the "special software package and documentation" which was to be delivered with the first computer system.[2] The

Jane Compton, New York City, for appellant.

Michael Wexelbaum, New York City (Sherman & Citron; Howard Karasik, New York City, of counsel), for appellee.

Before HAYS, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by a Chapter XI debtor, Law Research Service, Inc. ("Law Research"), an erstwhile supplier of computer services to legal researchers, from an order of the district court affirming the referee's order allowing in full the claim of a creditor, General Au-

1. It is difficult to see that this claim was made to the referee; rather, it appears that only the $14,000 price for the software package was contested since there was an admission that General was entitled to $75,625 (A108). On a basis unknown to us, the debtor claimed it was entitled to a quantity discount although it purchased only one system, a claim abandoned here.

2. A subsequent agreement dated July 1, 1970, was signed by General on July 23 and the debtor on August 18, 1970. It incorporates in typewriting a number of written insertions in the June 19 agreement and its only change of substance—not material here—relates to the percentage of discount allowable on quantities between 50 and 99 of systems delivered.

contract incorporated (1) General's standard "terms and conditions" which *inter alia* provided that "All clerical errors are subject to corrections"; (2) a June 18, 1970, letter relating to a firm, noncancellable order for one prototype system in consideration of which General agreed to "provide the initial software to enable you to operate your prototype system"; and (3) the letter in turn incorporated a quotation for the overall system which was made by General to debtor on June 10, 1970.

Only one system was ever ordered or delivered. That one worked up until the time the hardware was removed by General, apparently for nonpayment. The hardware was returned to the debtor, pursuant to a turnover order by the referee, dated July 22, 1971, but the system was subsequently not put back into operation for reasons that do not clearly appear. The creditor, General, seeks allowance of its claim on the basis of its "corrected invoice" and as we have said, prevailed below.

■ The appellant's first contention on this appeal is that the entire software package that was called for in the contract and duly ordered was not delivered. This claim is that insufficient "system documentation" was delivered to permit the debtor to operate the computer independently of General. There was evidence before the referee, however, that the system was at all times operating properly and that the alleged missing documentation was a manual which, according to the testimony of General, credited by the referee, is not delivered with special application software such as was specifically developed here for the buyer's specific needs. Operator's manuals and programmer's manuals were given as a part of the overall software [3] package delivered; these relate to the hardware itself and explain how to operate it. But nothing was furnished to explain and instruct the customer how

the software itself operated, although a description of the software system in summary form was attached to the original contract, or rather the letter of June 18, 1970, incorporated therein. The complaint of the appellant's president in testimony before the referee related to a lack of "documentation" but there was no evidence to show that in this type of special application, software material, in addition to that actually supplied, is required to be furnished, either by the custom of the trade or under the terms of the contract or its supporting documents. The contract itself called only for providing "the initial software to enable you to operate your prototype system." The referee's finding that the contracted for software was delivered is not "clearly erroneous," which under General Order No. 47 (28 U.S.C.) is our guideline for review.

■ The invoice question is more difficult, partly because the record is insufficient and partly because the appendix presented to us is both somewhat jumbled and incomplete. No more jumbled, however, than General's billing system; for a company in the business of selling computer systems, General's billing of appellant contained more errors, clerical or otherwise, than pocket computers have keys. One would hope that the legal research system General furnished was more error free, or Marbury v. Madison would have been programmed as a heroin conspiracy case.

We must bear in mind that there were three different lists of items to be purchased, with prices extended. The first is the June 10, 1970, quotation attached to the original contract. The second is the December 31, 1970, invoice. The third is what we have called the "corrected invoice" which was also dated December 31, 1970, but which was delivered on an unknown date. Each of these three documents contained a list of items different from the other two, although

---

3. Software was defined as "the instructions that you give a computer that tells the computer what it is supposed to do when you want it to do it." It includes memory tapes, punch cards and paper tapes programmed to instruct the computer what to do.

many of the listed items were the same. The June 10 quotation and the "corrected invoice" contain some of the same prices for items which are apparently the same, although in some cases their descriptions differ slightly. The uncorrected December 31, 1970, invoice contains seven items [4] which carry a lower price than those on the "corrected invoice" and the latter contains one item which is not on the December 31 invoice.[5] Appellant argues that the original December 31, 1970, invoice is controlling, and its argument is supported by the fact that a statement was rendered to it by General on January 31, 1971, referring back to the figure set forth in that invoice.

Appellee argues that the referee's conclusion that the corrected invoice was mailed on the same date as the incorrect one should not be disturbed under General Order No. 47, *supra*. But, as the General brief admits, the referee's conclusion of mailing on the same date is based on the fact that the invoices "both had the same date, were part of Claimant's business records and were in fact delivered to Debtor." The mailing of the January 31 statement, however, raises a serious question as to the accuracy of this conclusion. In any event there is no evidence in the record to support the finding that the corrected invoice was mailed on December 31, 1970.

But, General argues, the general terms and conditions of its contract authorized it to correct "clerical errors." The contract provided no time limit for such correction, which presumably should be permitted only during a reasonable time. *Cf.* New York Uniform Commercial Code § 2–321 (requiring settlements on certain contracts to be made with "commercial promptness"). What that time is we will leave to the referee and the district court to say, in the light of such evidence as may be offered on remand.

An additional question arises, however, this time on the suggestion of appellant, that the December 31 invoice did represent the correct billing and that the corrective invoice did not. But in any event the record is deficient. While the "corrected invoice," in reference to items such as the SPC–16 Controller or the 4K Memory [drums], does reflect the prices contained in the June 10, 1970, quotation, and the December 31 invoice does not reflect them, the contract clearly called for payment of "the GA list price at the time of the purchase release" (Par. 2.1), *i. e.*, at the time Law Research Service, Inc., "released" any given system for delivery or ordered it pursuant to the overall arrangement. Presumably the time of the purchase release for this first system which is at issue is June 25, 1970, the date of Law Research Service's Purchase Order No. 824. While General's evidence indicated that the prices on the corrected invoice were list prices,[6] there is no evidence

---

4.

| Item | Dec. 31 price | Corrected invoice price |
|---|---|---|
| 1 SPC–16, 4K Controller | $ 9,200 | $10,000 |
| 2 4K Memory | 7,200 | 8,800 |
| 1 Console TTY ASR–33 | 950 | 1,800 |
| 1 Disk Drive and Controller | 35,000 | 41,900 |
| 1 Multiplexed Data Channel | 1,750 | 2,000 |
| 1 1665 Data Channel Interface Adapter | 250 | 500 |
| 1 1910–0000 System Enclosure | 800 | 1,800 |
| Total | $55,150 | $66,800 |

5. An FGBG option at $500. The shipping and handling charges on the two invoices were the same, but the discounts were different. Thus the total of the differences between the invoices of the items in footnote 4 and $500, *i.e.*, $12,150, is the amount involved in this dispute.

6. After testifying that the equipment actually shipped to debtor was that equipment listed on the "revised" invoice (A116), Mr. Ducey testified that he was "familiar" with the list prices of the items listed on that invoice. Mr. Ducey was then permitted to draw the conclusion, over the objection of debtor's counsel, "That [the total price reflected on the revised invoice] is the correct amount owing." (A117.) It would seem logical to expect that the best evidence of the list

that they were the June 25, 1970, list prices. A remand will determine that also.

The decision of the referee, as affirmed by the district court, is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.

---

prices of the various equipment listed on the revised invoice—assuming that those were the items shipped—would be either a published price list effective as of June 25, 1970, or business records of General that serve the same purpose. Even the "certainty" with which Mr. Ducey assured the referee of his personal knowledge as to what equipment was actually shipped is called into question by the fact that the equipment listed on the revised invoice does not even correspond to that listed in the letter of April 20, 1971, *supra.*